IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA, Plaintiff,

v.

NOE RAMIREZ-MARES, Defendant.

CR 05-155-RE

OPINION AND ORDER

REDDEN, Judge:

On April 13, 2005, Defendant Noe Ramirez-Mares was indicted as an illegal alien in possession of a firearm and Social Security Fraud. He filed this motion to suppress all physical evidence and statements taken from him on or after March 30, 2005 (doc. 24) claiming: (1) he was unlawfully detained by Multnomah County Sheriff's deputies in violation of the Fourth Amendment; and (2) his consent to the sheriff's deputies search of his bedroom was involuntary. The parties submitted evidence at a March 21, 2006 oral argument.

**Factual Background**

At 7:51 a.m. on March 30, 2005, Debbie Johnson called the Multnomah County Sheriff's Office complaining about a problem with tenants living in her employer's rental property next door. Ms. Johnson is the caretaker for Mr. Don Nichols, who owns the rental property. Mr. Nichols' home and the rental property share the same driveway. Ms. Johnson complained that the tenants had parked several cars in the driveway and on the adjacent lot for some time. Earlier that morning, Mr. Nichols told the tenants to remove the cars from the property. Mr. Nichols and Ms. Johnson had previously complained to law enforcement officers about the tenants whom they suspected were operating a "chop shop" on the property. Johnson said she thought the tenants were involved in drug activity based on the high volume of foot traffic at all hours.

At 8:33 a.m., Multnomah County Sheriff's Deputies Ken Yohe and Matthew Adams arrived at the property. They had been called there before. The property attracted a large transient population, and the Sheriff's Office had investigated drug and criminal activity at the site. Mr. Nichols had earlier given the Sheriff's Office blanket authority to investigate suspected criminal activity on the property.

Yohe approached a Hispanic male, later identified as Herrera Salvador Ayala. He was working on what appeared to be a stripped out Volkswagen Scirocco. Ayala said he had just bought the car from a friend. A records check on the vehicle identification number was clean, and there were no outstanding warrants on Ayala.

Yohe asked Ayala where he lived, and Ayala pointed to the rental property. He said lived in the house alone and was the only one on the lease, but several other people were in the house. Yohe yelled toward the house telling the occupants to come

out, and one Paul Sanders did so. Sanders admitted that he was a registered sex offender recently off parole, and that he was staying at the house. Yohe then called for backup, and Deputy Steiner responded.

Yohe asked Ayala if he could go into the house, and Ayala said he could. Yohe and Steiner entered the residence between 8:47 and 8:52 a.m. and observed an engine cover and a car bumper in plain view in the living room. Yohe also observed two leather car seats in the back bedroom. Based on his extensive experience in stolen car or parts investigations, Yohe believed that the part were from a stolen car.

Yohe asked two Hispanic males, who had been sleeping in the living room, to go outside. They did so. Yohe then knocked on the southeast bedroom door, which was locked, and announced "Sheriff's Office." Defendant's girlfriend Grace Essy immediately opened the door, and Yohe saw Defendant Noe Ramirez-Mares sleeping on the bed. Yohe did not enter the room, but asked Essy and Defendant to come out of the bedroom and sit on the living room couch. They both agreed. The officers were in uniform, with visible firearms, ammunition, and handcuffs. Their guns were not drawn at any time, and the deputies did not raise their voices or threaten Defendant.

In the living room, the officers said they were investigating a stolen car complaint, and Yohe asked Defendant if he lived at the address. Defendant said "yes." Yohe later testified Defendant was cooperative, and spoke and understood English.

Yohe then interviewed Ms. Johnson next door while Deputy Steiner remained at the front door keeping an eye on the tenants. He did not ask any questions. His role was to provide security for Yohe. None of the occupants were handcuffed or restrained. They were cooperative with the officers' requests. Yohe testified, however, Defendant

was "probably" not free to leave.

Ms. Johnson told Yohe she saw Sanders driving a Jeep Cherokee to a church parking lot earlier that morning. She had also seen Sanders driving a stripped out Infinity the day before, which she later observed being towed from a nearby property. Yohe had information that a stolen Infinity had been recovered the previous day, one property north of Nichols' property.

At 9:25 a.m., Defendant, Essy, and the others were told to go to the porch where the officers continued to observe them. Essy later testified that they were detained in the living room for approximately forty-five minutes, and when moved to the porch, were instructed to sit down and not move. She also testified that the officers said they "were going to send us all to Mexico," and threatened Defendant with deportation. The officers denied making such threats, nor could they recall hearing such threats. There is no evidence that any of the officers knew Defendant's immigration status.

After interviewing Ms. Johnson, Yohe interviewed Sanders about the Jeep and Infinity. Sanders admitted that he had driven the Jeep off of the property because he thought it might be stolen. Yohe promptly arrested Sanders and interviewed him further about the potentially stolen Jeep. Sanders said he had lived at the house for about a month, and had used methamphetamine there the prior evening. He said Ayala was dealing methamphetamine out of the house, and that he had seen about 20 meth sales in the last two days. He also said he had seen a "snub nose .357" revolver at the residence, which belonged to Defendant, and claimed that Defendant, Ayala, and others stripped the stolen Infinity. Sanders admitted that he helped them move the car, and that parts of the interior of the stolen Infinity were in the residence.

Yohe called in the Special Investigations Unit (SIU) to assist. SIU Deputy Leonard Taylor arrived at 10:00 a.m., and Yohe briefed him about the potential stolen vehicles, firearm, and drugs. Taylor asked and received Defendant's permission to search the back bedroom. Defendant read a Miranda rights card–written in Spanish and English–out loud. Taylor asked him if he understood his rights and if he consented to a search. Defendant said "yes." Defendant also read and signed a consent to search form written in Spanish. The written form specifically advised Defendant of his right to deny permission to search his residence.

Taylor then called the Portland Police Bureau, and asked for a canine search unit. Before the canine unit arrived, but after Defendant gave his consent, Deputy Timothy Wonacott searched the Defendant's bedroom and found a glass pipe which appeared to contain methamphetamine residue. Essy admitted it was hers. At 11:15 a.m., a Portland Police Bureau canine unit searched the residence, and alerted to several items on Defendant's bed, including a wallet containing currency and marijuana, and a loaded Ruger .357 revolver. Deputies also found an electronic gram scale and plastic baggies in the residence.

Yohe questioned Defendant about the gun. After first claiming that he didn't know anything about the gun, Defendant admitted it was his.

Based on the gun and narcotics evidence, Taylor contacted U.S. Immigration & Customs Enforcement (ICE), and spoke with Agent Ted Weimann. Taylor testified that it was standard practice to call ICE and verify a suspect's identification when making an arrest for narcotics violations.

Weimann then spoke with Defendant, identifying himself as an immigration

agent. He asked Defendant if he preferred to speak in English or Spanish, and Defendant said it did not matter because he spoke both languages. Weimann asked the Defendant if he had been Mirandized, and if he understood his rights. Defendant said "yes." He told Weimann he entered the U.S. illegally, and he lived here for seven years. He admitted he obtained a job using a false social security card. Defendant was arrested.

About an hour and a half later, Weimann phoned Defendant at the Multnomah County booking facility. He again asked Defendant if he had given police permission to search his bedroom, and Defendant again said "yes." Defendant then claimed the police threatened to call immigration if he didn't grant permission to search his bedroom. Yohe and Taylor testified under oath to the contrary.

On April 1, Defendant was interviewed by ICE Agents Todd Clements and Samuel Clawser at the Portland ICE office. Defendant assured the agents that he spoke and read English. Clements read the Spanish Miranda Advisement of Rights form to Defendant, and he wrote "yes" next to questions asking if he understood his rights and was willing to waive them. Defendant signed and dated the form.

During the interview, Defendant admitted to illegally entering the United States, using a false social security card to obtain employment, and possessing the Ruger .357 revolver. Defendant was charged with illegal possession of a firearm and social security number fraud. Defendant had two prior misdemeanor convictions and was advised of his Miranda rights in each case.

## Motion to Suppress

Defendant argues law enforcement officers violated his rights under the Fourth and Fifth Amendments to the U.S. Constitution, and Miranda v. Arizona, 384 U.S. 436 (1966). Defendant asserts that neither the statements made on March 30 or April 1, 2005, nor the gun seized by deputies are admissible evidence because: (1) the officers unlawfully seized and detained him in violation of the Fourth Amendment without reasonable suspicion or a warrant; (2) Defendant did not voluntarily consent to a search of his bedroom; and thus (3) all statements and evidence subsequently obtained by the officers on March 30 and April 1, 2005 are tainted by Fourth Amendment violations, and must be suppressed as "fruit of the poisonous tree." Wong Sun v. United States, 371 U.S. 471, 487 (1963).

## Analysis

### A. Initial Entry into the Residence

The Multnomah County Sheriff's Office did not have a warrant to enter the house, but neither party seriously disputes that the deputies obtained Ayala's voluntary consent to enter the residence. Ayala had actual and apparent authority to consent to a search of the home, and he did in fact voluntarily consent to a search of the residence.

Ayala's consent to search the residence, however, did not extend to a search of Defendant's locked bedroom. That the door was locked, and Yohe knocked and announced, suggests that Yohe was aware that Ayala's consent was proscribed, and that Defendant had a reasonable expectation of privacy in the bedroom. When Essy opened the door, the officers did not immediately search the room. Instead, they waited

to search until they obtained Defendant's consent.

**B. Yohe's Knock and Announce**

Defendant asserts Deputy Yohe seized and detained him in violation of the Fourth Amendment when Yohe knocked on his locked bedroom door, announced "Multnomah County Sheriff," and asked him to sit on the living room couch. Defendant argues that his compliance was not consensual, but "mere submission" to a claim of lawful authority. See Kaupp v. Texas, 538 U.S. 626, 631 (2003) (A Defendant's response of "okay" was insufficient to show consent where a group of police officers woke a teenager up in the middle of the night with the words "we need to go talk."). Defendant asserts that the encounter amounted to an unlawful seizure under the Fourth Amendment because he was not free to "ignore the police presence and go about his business." Florida v. Bostick, 501 U.S. 429, 434 (1991).

I disagree. Defendant's rights were not violated by Deputy Yohe knocking on Defendant's door, and asking Defendant to come out of the bedroom. Seizure occurs when a law enforcement officer, through coercion, "physical force, or a show of authority, in some way restricts the liberty of a person." United States v. Chan-Jimenez, 125 F.3d 1324, 1326 (9th Cir. 1997) (citing Bostick, 501 U.S. at 434). A seizure does not occur simply because a police officer approaches an individual and asks a few questions. Bostick, 501 U.S. at 434. Indeed, "[w]hen police knock on a door without demanding entrance, and an occupant opens the door, no search or seizure for Fourth Amendment purposes occurs." United States v. Aguilera, 25 Fed. App'x 594, 595-96 (9th Cir. 2001).

Here, Yohe lawfully entered the residence based on Ayala's valid consent, and

observed what he suspected were stolen car parts in the living room. He then knocked on Defendant's locked door and announced, "Sheriff's Office." This let Defendant know who was at his door. Yohe neither commanded Defendant to "open up," nor did he have his gun drawn. When Defendant's girlfriend, Grace Essy, answered the door, only Yohe was at the door. Yohe asked Essy and Defendant to exit the room and sit on the couch, and they agreed. Yohe's manner was not aggressive; he did not raise his voice, command, or threaten Defendant when making this request, and Defendant made no objection. Defendant was not seized within the meaning of the Fourth Amendment.

Defendant also argues that Deputy Yohe effected an unlawful search of the bedroom in violation of the Fourth Amendment when Essy opened Defendant's door and the officer gained "visual entry." See United States v. Winsor, 846 F2d 1569, 1573 (9th Cir. 1988) (Officers "searched" the defendant's apartment when the defendant opened his door in response to the officers' demands to "open up."); but see Davis v. United States, 327 F.2d 301, 303 (9th Cir. 1964) (No illegal search when officers knocked on the defendant's door and told the defendant's daughter, "I would like to speak to Albert," and the daughter let them in the home.). Thus, the Ninth Circuit has distinguished situations where officers demanded entrance from situations where they knocked and the door was opened voluntarily. As to conflicts in testimony as to whether Yohe demanded entrance, I find Yohe's testimony more credible in light of Essy's admitted abuse of methamphetamine at the time. Neither Essy nor Defendant dispute the fact that Yohe asked–not ordered–them to come out of the bedroom. I find that Deputy Yohe neither unlawfully seized Defendant, nor searched his bedroom simply because he knocked and announced, and asked them to come out.

**C. Continued Detention**

An initially consensual encounter between a police officer and a citizen can be transformed into a seizure or detention within the meaning of the Fourth Amendment, "if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." Immigration and Naturalization Serv. v. Delgado, 466 U.S. 210, 215 (1984) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)). An investigatory detention of a suspect premised on a reasonable suspicion that the suspect is involved in criminal activity is not per se unconstitutional, however, so long as the stop is brief and minimally intrusive. United States v. Sharpe, 470 U.S. 675, 684-85 (1985). When assessing whether an investigative stop was too long in duration–so as to constitute a de facto arrest requiring probable cause–the court considers whether, in light of the surrounding circumstances, the police diligently pursued a means of investigation that was likely to confirm or dispel their initial suspicions as quickly as possible. Id. at 686. When making such determinations, "common sense and ordinary human experience rather than bright-line rules serve as our guide." United States v. Meza-Corrales, 183 F.3d 1116, 1123 (9th Cir. 1999). More intrusive and aggressive police conduct may be allowed without deeming the encounter an arrest, when circumstances suggest such actions are a reasonable response to legitimate safety concerns. See id. (a fifteen to thirty minute detention of a suspect outside his residence was reasonable because police were securing the area, gathering information about the identities of the detainees, the suspect's criminal history, and whether the detainees would consent to a search of the residence).

Defendant's initially consensual encounter with law enforcement officers

developed–at some point–into a detention under the Fourth Amendment. Here, the deputies had reasonable suspicion, however, to believe that criminal activity was occurring. Twice, the owner of the property and his caretaker called the Sheriff's Office to report a possible stolen vehicles and drug activity on the property. When Deputy Yohe arrived on the scene, he observed Ayala working on what appeared to be a stripped out car. The vehicle identification report came back clear, but Yohe knew from experience in stolen car investigations that stolen cars may go unreported. Inside the residence, Yohe observed an engine cover, a bumper, and two leather car seats, which–based on his experience–appeared to be stolen. The deputies had good reason to suspect that criminal activity was taking place on the property, and that the Defendant may be involved in the activity.

The investigative detention of Defendant was brief and minimally intrusive. Deputies asked him to sit on the couch. Defendant was not physically restrained or interrogated. Initially, the deputies asked Defendant one question: whether he lived at the residence. By all accounts, Defendant sat on the couch for twenty to thirty minutes while deputies interviewed others. Yohe's interview with Sanders lasted twenty minutes, during which Sanders told Yohe that parts of the stolen Infinity were in the residence. Sanders' statements also corroborated the neighbors' reports of drug activity on the premises. Yohe's initial suspicions of criminal activity involving theft and narcotics developed into probable cause for the arrest of Defendant when Sanders told him that Defendant had a gun and had helped strip out the stolen cars.

The officers here sought to confirm (or dispel) their initial reasonable suspicions as quickly as possible, and took only those measures that were reasonable under the

circumstances to effectuate that goal without any risk to themselves or the public. Deputies were concerned about their safety. The property was large and had a transient population, with people living in trailers as well as the rental unit. Under these conditions, the deputies' initial actions, including asking Defendant to sit unrestrained on the couch, were reasonable responses to an uncertain security situation. Law enforcement officers must have some practical means of securing an area when investigating criminal activity and ascertaining the identities and criminal history of individuals at the scene. Under the circumstances, it was reasonable for the deputies to ask the suspects to stay in a common area while they investigated their reasonable suspicions.

The fact that deputies told the Defendant to go out to the porch does not significantly alter the analysis. Police may move a suspect without exceeding the bounds of an investigative detention when it is a reasonable means of achieving the legitimate goals of the detention "given the specific circumstances" of the case. United States v. Charley, 396 F.3d 1074, 1080 (9th Cir. 2005). It was reasonable to have the potential suspects sit on the porch while deputies sought to secure the premises and to interview the various occupants and neighbors.

Defendant argues that the Fourth Amendment never allows law enforcement officers to conduct a Terry-type investigative search or seizure in any home. Defendant asserts "absent exigent circumstances, probable cause alone cannot justify an officer's entry into a person's home." LaLonde v. County of Riverside, 204 F.3d 947, 954 (9th Cir. 2000) (citing Welsh v. Wisconsin, 466 U.S. 740, 749-50 (1984)). Defendant argues that the investigative stops authorized by Terry v. Ohio are premised on minimally

intrusive seizures in public, and do not apply to a warrantless entry to seize a person in his home. See Payton v. New York, 445 U.S. 573, 590 (1980) (The Fourth Amendment prohibits police officers from making a warrantless entry into a person's home, unless the officers have probable cause and are presented with exigent circumstances); LaLonde, 204 F.3d at 954 (probable cause is a precondition for any warrantless entry to seize a person in his home); Ybarra v. Illinois, 444 U.S. 85, 94-96 (1979) (a warrant to search a tavern did not, by itself, establish a reasonable suspicion to search individuals within the tavern under Terry); United States v. Winsor, 846 F.2d 1569, 1573 (9th Cir. 1988) (unlawful search of a defendant's home when defendant answered the door and police gained visual entry). Defendant asserts his detention was unlawful because deputies had neither exigent circumstances nor probable cause to enter his home to seize him.

Defendant misreads the import of those cases. In Ybarra, the Court considered whether police had reasonable suspicion to stop and frisk a tavern patron because they had a warrant to search the tavern itself for drug evidence. The Court concluded that in the absence of some further articulable suspicion as to the particular patron, the warrant to search the tavern did not establish reasonable suspicion justifying police search and seizure of every individual in the tavern. Here, Defendant's consensual encounter with the officers developed into a detainment because the deputies developed reasonable suspicion specific to Defendant.

Payton, LaLonde, and Winsor addressed whether reasonable suspicion could justify law enforcement officers' initial warrantless entry into a residence–not whether police could detain a suspect after they had gained lawful entrance. Here, Ayala–the

sole lessee–gave the officers consent to enter the residence. Thus, unlike Payton, LaLonde, and Winsor, the officers had legal authority to be in the residence.

I disagree with Defendant's argument that investigative detentions are never permissible in any home. See United States v. Charley, 396 F.3d 1074, 1079-80 (9th Cir. 2005) (no unlawful detainment when police were invited into a suspect's relatives' home–where the suspect was at the time–and took the suspect to a patrol car based on the reasonable suspicion that something "bad" had happened to the woman's children). It would be unreasonable and impractical to require an officer–lawfully present in a home at the time he develops a reasonable suspicion of criminal activity–to risk his safety and the safety of others by leaving to obtain a warrant.

Defendant's consensual encounter developed into an investigatory stop, but the deputies had reasonable suspicion to detain him. Defendants detainment was brief, minimally intrusive, and reasonable in light of the scope of the investigation, and was therefore not a full-scale arrest. The deputies had probable cause to arrest.

**D. Consent to Search**

Defendant argues that he did not freely and voluntarily consent to a search of his bedroom, but if he had, that purported consent did not purge the taint of the deputies' unlawful seizure. He urges that any evidence obtained as a result of the illegal seizure and his subsequent consent must be suppressed. Defendant was not unlawfully seized within the meaning of the Fourth Amendment, and his consent and the evidence thereby obtained was not inherently tainted. I conclude Defendant freely and voluntarily consented to a search of his bedroom.

As noted, a defendant's voluntary consent to search is a well-established

exception to the Fourth Amendment's prohibition on warrantless searches. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). Whether consent was voluntary is a question of fact based upon the totality of circumstances surrounding the consent. United States v. Castillo, 866 F.2d 1071, 1082 (9th Cir. 1988). When determining whether a defendant's consent to search was voluntary, a court may consider several factors, including: (1) whether the defendant was in custody; (2) whether the officers had their guns drawn; (3) whether a Miranda warning had been given; (4) whether the defendant was told he had a right not to consent; and (5) whether the defendant was told that a search warrant could be obtained. United States v. Torres-Sanchez, 83 F.3d 1123, 1129-30 (9th Cir. 1996). These factors are only guideposts, however, and not a mechanized formula to resolve the voluntariness inquiry. United States v. Soriano, 361 F.3d 494, 502 (9th Cir. 2004).

Defendant voluntarily consented to a search of his bedroom. Defendant was neither physically restrained, nor did any of the arresting officers have their weapons drawn. There is no evidence that Defendant was physically threatened or coerced. Importantly, Defendant was allowed to read both Spanish and English versions of his Miranda rights aloud from a laminated card. He then read and signed a Spanish version of a written consent form, which informed him of his right to refuse consent to search. The arresting officers also testified that Defendant appeared to understand English and to communicate effectively with law enforcement officers. When asked questions in English, he responded without hesitation.

Defendant's claim that officers threatened to call immigration if he did not give consent is not credible. The officers testified under oath that they made no such

comment; nor did they recall any other officer making such comments. Defendant did not mention such a threat to ICE Agent Weimann until approximately an hour and a half after he first spoke to him, and there is no evidence that officers knew of Defendant's immigration status when they obtained his consent. It was only after the officers found the gun, marijuana, and a glass pipe that Defendant's identification and immigration status became an issue. I find that the officers' testimony was credible. Defendant was not threatened regarding his immigration status. His consent to search was freely and voluntarily given.

**E. Waiver of Miranda**

Defendant argues that his waiver of Miranda rights, and his subsequent statements on March 30, and April 1, 2005, are inadmissible as fruit of the alleged unlawful seizure. The court disagrees that the seizure, consent, and subsequent search were illegal. Based on the totality of the circumstances, the court also concludes Defendant's waiver of Miranda rights was made voluntarily, knowingly, and intelligently. Thus, Defendant's subsequent statements are admissible.

For the reasons discussed above, Defendant's motion to suppress (doc. 24) in DENIED.

IT IS SO ORDERED.

Dated this 12th day of June, 2006.

/s/James A. Redden
James A. Redden
United States District Judge